We'll hear from Mr. Ferugia, and if I mispronounce that, please correct me. Good morning, teachers. My name is Ferugia. Ferugia. Thank you. Good morning. You may proceed when you're ready. Good morning, Chief Judge Elrod. Good morning, Judge King. Good morning, Judge Graves. My name is Victor Ferugia, and it's my honor to represent Virginia Adams in this case, and this is an FMLA interference case. The main issues that we're going to cover are whether or not a reasonable person would have been discouraged in applying for FMLA leave for tardy occurrences after her supervisor told her in writing several times not to use FMLA leave for tardy occurrences, and after she told her several times that she cannot do that. And that period lasted several months, and then the company changed its position. And the other issue we're going to get to is whether or not a violation of FMLA prejudiced my client. So those are the main issues we're going to be covering today, but first I would like to take your indulgence for just a minute to let you know who Virginia Adams is and what her serious medical condition is. And so she studied three years biochemistry at Mississippi State and has an associate degree from Delgado in medical technology. She has a bachelor's degree in microbiology from Southeastern Louisiana University. She's a clinical laboratory scientist. She has a CLS license. She was employed at Lakeview Medical Center for over 10 years. She resigned for the company for a period of seven months and then went back in January 2018. And she was hired by Ms. Shimrosky, who had been her supervisor in her first employment. So she knew Ms. Adams when she hired her, and when she hired her, Ms. Adams told her of her disease that was getting worse, unfortunately. So she was hired into the evening position of the lead tech responsible for serology and urinalysis department at their laboratory. So her serious medical condition is mast cell activation syndrome, MCAS, or sometimes it's called mast cell disease. And it causes episodic, unpredictable symptoms, particularly in the mornings. So in the fall of 2018, Shimrosky began to question Ms. Adams about her tardy occurrences. And so Ms. Adams provided her, on October 1st, a diagnosis from Dr. Olivier, her doctor, who explained the symptoms of mast cell disease as dizziness, nausea, vomiting, and diarrhea. That's on ROA 3281. That's the letter that she shared with Shimrosky. And in that letter, Dr. Olivier states that the symptoms were worse in the mornings and tried to give her evening shifts when the symptoms were less. So that was one reason she took this position, because it started at 11 a.m. and she thought she could handle this position. She was eligible for FMLA leave on October 9th, so you have to have 1,250 hours in that year. So she finally got those hours in by October 9th, and she applied for FMLA leave, intermittent leave. And so she completed the certification. The company required a certification from her doctor. Now this is optional. Employees don't have to, you know, if they say it's obvious, they don't have to request a certification. But they can if they want to. So Lakeview, on the first day that she applied for FMLA leave, they asked for a certification from Dr. Olivier, and he had 15 days to provide it, and Dr. Olivier complied with that. He supplied that certification 15 days later, October 24th. So in that certification, he indicated that she would need intermittent leave for follow-up medical appointments. That's the first thing. And the second thing that he said, the disease would also cause episodic flare-ups, periodically preventing her from performing job functions. That's on the certificate and whatnot. Mr. Farooja, what prejudice or how was she harmed by the alleged FMLA interference here? Because it's my understanding that it's undisputed that she was not terminated or moved to a different unit or any kind of job detriment relating to the fact that she was tardy on numerous occasions. That it might have been mentioned, but that's not why she was ultimately terminated from her position. Thank you, Your Honor. Yes, the prejudice, for one thing, if you're looking for a dollar amount, these FMLA cases are typically low dollar amount cases because it's unpaid leave. No, we're looking for kind of some harm.  She has to have actually caused some interference with her job in some sort of way, the failure to treat her FMLA, the misunderstanding that she and her supervisor had where she was reported for these tardies. That didn't seem to have any effect on her ability to continue her job or to be doing any particular job. That's undisputed that that's not why she was let go, isn't it? That was decided in the case. I mean, we disputed it, but that was decided in the first appeal. Right, so we can't... So we're not going to go into reasons for termination. She was let go because she was late, and she wasn't accommodated in the FMLA leave to be late. She wasn't let go for that reason. We have to take that as given. So how do you have a case? What is your case here? Okay, so the case is she does... There were other violations of FMLA besides her being discouraged from applying for FMLA leave for tardies. And one of them is that she was required to log her FMLA leave in 30-minute increments. And this happened for the beginning, and then once she brought this problem to the company's attention, then they changed their policy even in their handbook and said, oh, no, you can log in with 15-minute increments because that's the increments that they use for other leaves. Was there ever a written policy that it be 30-minute increments? You said they changed their policy. Yeah, there was. They changed it because... You're saying there was a written policy. There was a written policy. 30 minutes. Yes. And then it was changed to 15 minutes. How is that something that's actionable? It's actionable. After she told them that it should be lesser... Well, they didn't do it. And they did it, and that she wasn't harmed by that. But they didn't do it right away. They made her do this for months, for 15, and she had to, you know, wait to sign in because she could only do it in 30-minute increments. So we have days like on October the 9th, 5 hours and 30 minutes. She had to wait that 30 minutes instead of 5 hours and 15 minutes. So she lost time. I don't understand. What do you mean she had to wait 30 minutes? Okay. So it had to be in 30-minute increments. I understand that. Okay. Okay. In this particular case, she had to go for an appointment. This is a 5-hour, 30-minute appointment. So she would, the timing on when she left, she would have liked to have made it only leave for 5 hours and 15 minutes. But the rule was... So they made her use, you said she had to wait. Well, she had to wait at, in this particular case, she... Instead of going back to work at 5.15, she waited until 5.30 to go back? Is that what you're saying? In this particular case, the 5 hours and 30 minutes, she was at work, and she left early to go to this appointment. So she had to leave before she wanted to leave because it had to be... She wouldn't have left so early. She would have stayed longer at work. Exactly. 15 more minutes. 15 more minutes, and she would have been paid for that. Okay. But there are other, you know, on the 24th, it was an hour and 30 minutes, and she wanted her leave to be an hour and 15. On the 25th, hour and 30 minutes. Again, same thing. Now, on November... Is there a federal regulation that says it can't be 30 minutes? There is a regulation that says... It doesn't say it cannot be 30 minutes. No, no, no. It says that it has to be the smallest interval that you use for your other leaves. And that was the problem. So now on November 1st, she applied for FMLA leave for a tardy because she was late getting to work from her... And on that particular day, so she had... By November 1st, she had figured out that, wait, the company can't be doing this. I have to be able to use tardy occurrences because of my disease, and it is covered by FMLA, although they're telling me not to use it. So on that date, November 1st, she did apply for FMLA leave, even though her supervisor was telling her not to apply for it. And she did it. Sedgwick approved it, which was time away from work. They approved it. And the next day, she was disciplined. She was given discipline for absences. And so she didn't do it again because she was told again. And then on, like, November 7th, she got another PIP, another written instruction, don't use it, and so she didn't use it until the company changed their policy. On January 9th, they changed their policy. And so then you'll see, and they'll say, well, wait, we did it great after January. We let you do it. Well, but what about the three months when you didn't let her do it? So there were times. So this is some actual monetary damages in this policy. So I, you know, how was she damaged? She had to work on. . . I don't understand what the monetary damages are for these TARDIs. The actual damages? I don't understand where there's any actual monetary damages for the TARDIs. I do on the 1530 that perhaps that might be. But on this, I still don't see how there's any actual damages on this. Well, it's a clear violation. She had to live at work with the threat of being terminated. Every one of these PIPs said, you know, if you get two more attendance points, you're going to be terminated. So, you know, I think that's a prejudice. That's a working condition to work under that pressure. So monetarily, it's the 3015 is monetary loss. Like this, FMLA has fee shifting. They want competent attorneys to take FMLA cases, but they're small-dollar cases. So we want nominal damages. We're not saying this is de minimis. I mean, we want to go to trial and seek nominal damages, and we don't want injunctive relief. We can't get that. She's not working there anymore. I have a question that's pretty significant about the 30-minute time increments. Those claims were dismissed by the district court, and in the first appeal, that ruling was undisturbed. Why would that survive to this appeal on the 30 minutes? This remand was the interference claim. There was no mention at all in the appellate opinion about the 3015. There was no mention of it. It was not affirmed. It was not denied. But the whole interference claim was sent back with a question, wouldn't this discourage a reasonable person from applying? But that was not—the whole claim was sent back. So she has interference claims. They also didn't give her notice that she had— Why didn't the manager's discouragement comment was sent back? That's the problem. The case was remanded only on the manager's discouragement comment in Adams 1. It was not the whole thing on the 30, was it? Where in the opinion does it say that the 30 is also remanded? It doesn't say the 30 was considered. It doesn't say it was affirmed. It doesn't say it was denied. It was ignored by the defendants. It was ignored by the appellate court. But it's always been our claim. It's always been our claim. It was in our complaint. It was in all of our briefs. And it was a violation. It's still there. But it's not resurrected. If it was dismissed by the district court and wasn't ruled on in the court of appeals appeal and nobody said anything about it to the court of appeals in the first appeal and it doesn't get remanded back, then it's done, isn't it? The claim was sent back, the whole claim. It wasn't just the one question. It said for further proceedings. It sent back the whole claim of interference. And that was part of the interference claim. It was sent back. What's the evidence that they ever required 30-minute intervals? What's the evidence of that required? The evidence is the 30B6 deponent said, yes, they took a break to see if it was changed. And he said, yes, the policy was changed in our book. So there is evidence that there was a 30-minute policy and it was changed to 15. So they admitted that they had a 30-minute policy? In the 30B6 deposition, yes. All right. Thank you. I'll see what they say. You've saved time for rebuttal. Thank you, sir. Thank you. Good morning, maybe, or maybe it's afternoon, Your Honors. I'm Leslie Arrett. May it please the Court. I represent Columbia HCA Lakeview Regional Medical Center. I want to address what I think, Your Honor. I want you to tell me if y'all had a policy requiring that they take at least 30 minutes. We did not, Your Honor. Did somebody admit that in the 30B6 deposition? We did not, Your Honor. Eventually, that is correct, the policy was changed. In fact, it wasn't even changed. They allowed her to reduce the increments because she had so much absence and tardiness that they allowed her to do that. But there was no policy at all, and I think the record will reflect that. I also agree with Your Honors that the issue of the 30-minute increments is not on appeal. It was not part of the mandate at all. And if you really want to get, if anyone really wants to get into that, she took less than 30-minute increments. I mean, the record will show that. So it's sort of one of the, it's a, what I would call a well-stuffed red herring, not an issue. And also, I don't even see the damage on that because you have a bucket, just like the PTO argument, you have a bucket of time. And if you, you know, you can take X amount of time, just like she took time off under the FMLA and it was covered by her PTO. There's no monetary damage. We all know that's required. The only damage would be she would have billed for 15 more minutes and gotten paid for 15 more minutes. She was covered by her PTO, which was paid out. So she was still getting paid out, the full amount, the whole time? Yes. Okay, so it wasn't unpaid leave. Never. It was always paid. Always.  She got paid for the full shift. Yes, ma'am. Even when she was out. Yes, ma'am. And she had PTO remaining at the end of her, at her separation. She still had PTO remaining. So, but I agree, that's not part of the case. The case was submitted, remanded for a very specific and narrow issue. And if you'll allow me, I will address that. First of all, and really there are four points, some of which may or may not be interesting to the court, but I do think it's within the spirit of the court's mandate to make this decision. I don't think a jury has to make this decision on a reasonable record. On the issue of whether or not the court determined, made a reasonable person determination, the district court actually went past that. It looked at the very person who is claiming they were deterred and said she wasn't even deterred, much less a reasonable person. Then, as you have well noted, the district court found not once but twice that there was . . . or, yes, the district court, sorry, found not once but twice that there was no prejudice. And there's never been any showing of prejudice. And I didn't hear a word today that indicated there was prejudice. We know that the emotional distress that was described earlier is not prejudice under Ragsdale. It has to be a monetary damage. And there's been no showing whatsoever of monetary damage at all. The court looked at all of those possibilities in both district court opinions and made the determination that there was no prejudice. And I believe that ruling is undisturbed because that also was not part of the mandate. So I believe those two rulings are undisturbed. So really skipping to the issue of the reasonable person, I think that's whether a reasonable person would have been deterred, which is the only issue we'll hear about today. As I said, what better way to analyze whether a reasonable person would have been discouraged from taking FMLA under the circumstances than by analyzing what Adams did? And the district court discussed this PIP document that contained the supposedly deterring comment, and she encouraged Ms. Adams to apply for FMLA. In fact, my colleague, Mr. Farrugia, mentioned that that was happening over time even before she was eligible, that Ms. Shimrosky was encouraging her right when she was eligible to apply so she could be covered. In the same PIP, there was this supposedly deterring comment, but it's interesting because Lakeview's policy, and the district court discussed this, specifically excludes FMLA from the definition of TARDI, which, by the way, in the PIP had a capital T, TARDI, like defined term. And TARDI isn't an FMLA absence. We know from the record, and it's in the record, that Ms. Adams was TARDI many, many, many, many times, many of which, even when her health care certification in, that had nothing to do with her disease. It was that her car wouldn't start or this happened or that happened. And so there were very many other TARDIs in the record that had nothing to do with the illness. Most importantly, a reasonable person or Ms. Adams, being the reasonable person here, could not have been discouraged if they did not even see the supposedly discouraging comment. And the record in the briefing, and I've noted it, it's at document 25, which is a Pellance brief at page 12. Ms. Adams says she didn't see the PIP until November 2nd, that that was the first time she saw the PIP, the performance improvement plan. So how could somebody have been discouraged by a comment if they didn't see it until after the supposed discouragement? We've got multiple dates in October that she says she was discouraged from taking FMLA, and she didn't even see the PIP until November by their own briefing. And I went back and checked various other points in the record, and she said she signed the PIP in November 2nd, 2028, but here they specifically said in the brief that she did not. It was the first time she saw the PIP. But she was discouraged verbally. Well, she says that. The boss said, don't do this. She says she was discouraged verbally, not under oath in a deposition when I asked her, but in supplemental affidavits that were submitted, and I would submit to the court, and we briefed this in the district court, that that should be disregarded because conclusory statements that are post hoc declarations should not be considered, and I think the district court agreed with that. But the point is that she didn't see the supposedly deterring comment until November 2nd. She couldn't have been discouraged in October. So all of those dates, October 12, 15, 16, 18, 22, 26, 29, 30, tardies could not have been the result of discouragement. So that leaves three dates, November 2nd, January 8th, and January 9th. On November 2nd, that's the day after she had a tardy. She applied that very day after she was tardy and got approved for FMLA. So how are you going to be deterred the very next day? And then in January, those January dates are covered, and I'm a timeline person. I have to see things in timing, and I put together a little timeline. It's straight from the record with record sites that shows she had FMLAs granted for tardies all around those January dates. So why is she discouraged in the middle of all that? And I think you'll see that. Is this what you put up on our bench? Yes, ma'am. Did you give it to the other side? Yes, sir. Yes, ma'am. Did they say it was accurate and to have a chance to review it or anything? This is not in the record. This is not in the record. Okay. It's taken, and I called the clerk to find out what was protocol on that, and they said as long as it was in the record, then I have record sites there. So it may or may not be useful to you. I just think it's useful because it outlines the timing on things. There's a lot, a lot, a lot of pips. I mean, a lot, a lot of FMLA approvals, and I think you'll see in looking at that that they, and if we just look at it briefly, that there are approvals for tardies all around here, all around these dates. I mean, she had, in November, seven more FMLA requests other than the November 2nd one, or November 1st one, sorry, that were ranging from 30 minutes to eight hours. In December, she had a late arrival that was covered. December 14th. September 21st, she had a tardiness that was covered. Interestingly, December 24th, the day before Christmas, she was tardy that day, and that was covered. And then she also, December 24th, took an FMLA of two and a half hours. December 26th, the day after Christmas, she was tardy for ten minutes. That was covered. The New Year's Day, New Year's Eve day, 41 minutes was covered as a tardy. So in terms of a reasonable person, it's just very difficult to understand how someone would have been deterred by these comments when all of these tardies were approved. Not to mention the fact that when she was still in process of putting in her paperwork, and that's the import of the date of when she submitted her health care certification, because she hadn't even submitted it until October the 24th. So I think that timing is very important. She first applies because she becomes an eligible employee, and the terminology under the FMLA is a little strange sometimes, eligible and approved and that sort of thing. But she became an eligible employee on October the 9th, and then was denied, actually, on October the 9th. So we know she couldn't have been deterred on October the 9th, even if she had gotten the PIP then, because she had been denied, but then was told October 11th that she was approved retroactive to October the 9th as an eligible person, meaning she had the requisite number of hours. It wasn't until she submitted the FMLA certification from the health care provider that the certain types of tardiness were approved, and actually the tardiness that was approved was for medical appointments. But the hospital, again, I think, bent over backwards because they allowed her still to get approved. She never once was denied any FMLA, ever. Every single one she submitted was approved. And even for times that she came into work late, clearly not for an appointment, and submitted the FMLA request that day, and it was approved. And the record, I believe, will support that. So I think the point is that clearly she was not deterred, hadn't seen it until November, and even in October was still applying for multiple, multiple leaves. The prejudice is a deal killer. There's no prejudice. We have a U.S. Supreme Court case that says it has to be a monetary damage. There's no monetary damage here. That ruling is undisturbed. Threat of termination is not a monetary damage. So I don't think there's any prejudice here. I think I'd like to give Your Honors some time back unless you have any questions. Thank you. I think we have your argument. Thank you, Your Honor.  A few comments based on the argument presented by counsel. So the 15-day period between the time that you apply for FMLA leave and they request the certification from the doctor, that is FMLA-covered leave. So you don't have to wait for the certification to come in in 15 days to be covered. You're covered. And if it comes in on time, then you're covered for the whole period. The 15 days while you're waiting for it and the period after that. And even if you're late a few days, you would be covered the first 15-day period, plus once it came in from then on. So waiting around for the certification, no, that's not correct. Now, the certification and defense got it wrong throughout their brief. If you look at page ROA 3557, when ROA, actually the first one is ROA 2583. And that is the certificate by the doctor, and it's checked off, will this condition cause flare-ups? It's checked, and that's the one that was submitted on the 24th. Now, they wanted to clarify it because he indicated he couldn't estimate how frequent it would be, and it was sent back to the doctor, and then he clarified it on 3557 that it was up to five days a week, eight hours a day. So he clarified it. And so it was always the periodic intermittent was always covered by the certificates. So now a reasonable person, she in her affidavit. Now, it went back. We were denied discovery. So they filed another motion for summary judgment. We submit an affidavit. I mean, that's what happened. So a declaration. So in that, she says, I was deterred from taking the leave, specifically says I did it. I didn't take it because my boss told me not to, and I was afraid that I'd get fired if I did it because my boss kept telling me I was not to. Now, also I'd like you to look at record excerpt. The record excerpt, it's number 10. And that, it's signed by Janelle Shemrosky on the 9th, and Virginia Adams on the 9th. It's signed and dated the 9th. And even if, you know, if it wasn't looked at until the 2nd of November, why was it signed and dated on the 9th by both parties? Also, she was disciplined. And this is an important one on the 15th, record excerpt 15. She was disciplined for five, six attendance points for being tardies all these days, October 12, 15, 16, 17, 18, 22, 26, 29, 30, November 2nd, January 9th. She was written up and disciplined for all those tardies, and there was only one tardy that was not associated with her illness, and that was when she had a car trouble, and she told them she had car trouble. It's on the logs for the attendance, but everything else was related to her illness. The, yeah, so she never, you know, she was encouraged by that PIP for getting doctor's appointments. We never disputed that she could use intermittent leave to get her doctor's appointments. That was never an issue. And so the, you know, that's, we would like you to rule in our favor and send this back to trial. Thank you very much, Your Honor. Thank you. We have your argument. This case is submitted. The court will stand in recess until tomorrow morning at 9 a.m.